Darrel PENN, Appellant,

v.

Albert H. IVEY and Karen J. Ivey, Appellees.

No. 4113.

Supreme Court of Alaska.

July 11, 1980.

Irwin Ravin, Law Offices of Clem H. Stephenson, Fairbanks, for appellant.

Peter J. Aschenbrenner, Aschenbrenner & Savell, Fairbanks, for appellees.

Before RABINOWITZ, C. J., and CONNOR, BOOCHEVER, BURKE and MATTHEWS, JJ.

## OPINION

BURKE, Justice.

Plaintiffs, Albert and Karen Ivey, brought suit to quiet title to certain real property, claiming that they had acquired title thereto by adverse possession.[1] The record owner, Darrel Penn, counterclaimed, seeking to quiet his own title to the property. Judgment was entered for the Iveys, and Penn now appeals.

This case arises out of a dispute over the boundary line between two residential properties in the City of Fairbanks. The property in dispute is a portion of a driveway roughly 6 feet in width and 146 feet in length, situated between the Ivey and Penn properties.

Prior to July 1975, the driveway had been used by the Iveys and their tenants (and predecessors in interest) for access to their house and apartments located behind the house. In July 1975, however, Penn ordered a survey of his property, and pursuant to the findings of this survey, he constructed a fence through the center of the driveway. The fence made access to the Iveys' garage and rear apartments impossible.

Because the Iveys' claim of adverse possession depends on the conduct of their own and Penn's predecessors in interest, a brief statement of the history of ownership is appropriate. The facts before us are not in dispute.

In the late 1950's, Hez Ray purchased and occupied what is now the Ivey property. At the time of purchase the real estate salesman indicated that the east boundary of the driveway was marked by an existing birch tree. Relying on this statement, Ray never conducted a survey. Later on, Ray built a fence along the eastern boundary of the driveway which corresponded to the tree line he had assumed marked the boundary between his property and the adjoining lot. At that time, the Penn lot was owned by Mr. and Mrs. Bott. After the fence was built, Ray had the exclusive use of the driveway, to which the Botts never objected.

Don and Winona Porter purchased the lot from Ray in 1966. Mrs. Porter testified that she had lived in the vicinity for some time prior to their purchase and had seen the fence around Ray's property since at least 1964. Mrs. Porter assumed the boundary of their property was marked by the fence. The Porters used the driveway for access to their property until they sold it to the Iveys in 1973.

Penn purchased his lot from Mr. and Mrs. Bott in 1968. Penn questioned the Botts on the location of the driveway boundary. Mr. Bott stated he thought the fence was on their property, but was unsure of the exact location of the boundary. Penn testified that he told Mr. Porter he thought the fence might be on his property, but since the property had not been surveyed he could not be sure. He further testified that he gave Mr. Porter permission to continue using the driveway until the Porter's sold their property. This statement however, was denied by Mrs. Porter. She testified that neither she nor her husband had ever discussed the question with Mr. or Mrs.

1. AS 09.10.030.

Penn. According to Mr. Ivey, except for when he was building the fence, Penn never used the driveway.

In this appeal, Penn challenges the trial court's finding that the Iveys' possession, tacked to that of their predecessors in interest, was sufficiently continuous, hostile, and notorious to constitute adverse possession.[2] *Walsh v. Emerick*, 611 P.2d 28, at 30 (Alaska 1980). Specifically, he contends that their use was not hostile since, he claims, he gave the Porters permission to use the property. It is clear that the hostility requirement is not satisfied if the adverse claimant had the permission of the record owner to use the property. *Peters v. Juneau-Douglas Girl Scout Council*, 519 P.2d 826, 832–33 (Alaska 1974).

The only evidence of permissive use before the trial court was Penn's own testimony. This evidence however was directly contradicted by Mrs. Porter who testified that such a conversation had never taken place. It is the trial court's function, and not that of a reviewing court, to judge the credibility of the witnesses and to weigh conflicting evidence. *Associated Engineers & Contractors, Inc. v. H & W Construction Co.*, 438 P.2d 224, 227 (Alaska 1968). This is especially true where the trial court's decision depends largely upon oral testimony. *Curran v. Hastreiter*, 579 P.2d 524, 527 (Alaska 1978). *See also Shilts v. Young*, 567 P.2d 769 (Alaska 1977); *Frontier Saloon, Inc. v. Short*, 557 P.2d 779 (Alaska 1976); *Ayers v. Day and Night*

*Fuel Co.*, 451 P.2d 579 (Alaska 1969). The trial court's determination in the instant case may be reversed, therefore, only if it is clearly erroneous. Rule 52(a), Alaska R.Civ.P.

In his finding of facts, Judge Taylor stated:

4. This use of the premises continued for a period of at least ten years, or from 1964 to July 7, 1975. *The conversation in 1970 between Darrel Penn and Don Porter concerning the former's ownership of the disputed strip did not result in the latter's clear-cut acknowledgement of Penn's rightful ownership of the strip.* Thus, the continued possession remained adverse and not permissive. [Emphasis added.]

From our review of the record we are unable to say that Judge Taylor's finding was clearly erroneous. Having determined that Iveys' use of the land was not permissive we must now consider whether the other requirements of hostility have been established.

Penn's argument assumes that hostility implies bad feelings or antagonism. Such is not the case. In *Peters* we held that: "[the claimant's] beliefs as to the true legal ownership of the land, his good faith or bad faith in entering into possession (*i. e.*, whether he claimed a legal right to enter, or avowed himself a wrongdoer), all are irrelevant." 519 P.2d at 832.[3] The proper

---

2. AS 09.10.030 allows title to be perfected by adverse possession when, as here, the claim is made without color of title. This section provides:

   *Actions to recover real property in 10 years.* No person may bring an action for the recovery of real property, or for the recovery of the possession of it unless commenced within 10 years. No action may be maintained for the recovery unless it appears that the plaintiff, his ancestor, predecessor, or grantor was seized or possessed of the premises in question within 10 years before the commencement of the action.

3. *See also* 7 R. Powell, Real Property § 1015, at 725–26 (Rohan rev. ed. 1979). In this treatise, Powell quotes an early and well-accepted decision:

   "Into the recesses of his [the adverse claimant's] mind, his motives or purposes, his guilt or innocence, no inquiry is made. . . . The very nature of the act (entry and possession) is an assertion of his own title, and the denial of the title of all others. It matters not that the possessor was mistaken, and that had he been better informed, would not have entered on the land. . . . "

   *Id., quoting French v. Pearce*, 8 Conn. 439 (1831). Powell also notes that this viewpoint has gained increasingly widespread acceptance. "On the whole the law is simplified, in the direction of real justice, by a following of the Connecticut leadership on this point." *Id.* at 727–28.

determination of whether the required degree of hostility exists is whether the acts of the claimant are the acts of an owner, sufficient to give the record owner notice of the possessor's claim. *Id. See also Alaska National Bank v. Linck*, 559 P.2d 1049, 1053 (Alaska 1977).

The facts before us meet that requirement. A fence was built alongside the driveway in such a way as to exclude any of their neighbors from using the driveway. From at least 1964 until July 1975, the driveway was used only by the residents of the house and attached apartment, and their guests. Certainly that is how a record owner would use a driveway. No one seeing the fence or the driveway could have assumed that the driveway belonged to anyone other than the owners of the adjoining house and garage. In light of this convincing evidence, we believe that the fence, which existed at least since 1964, was sufficient to put the record owner on notice of the adverse possessor's claim of right.[4]

Penn's final argument is that the Iveys were improperly allowed to tack-on the adverse possession of their predecessors in interest, Ray and Porter. He argues that the statute of frauds, As 09.25.010(b),[5] prohibits the transfer of property without a written instrument, and therefore the Iveys could not have acquired their predecessor's interest in the disputed strip without a written deed. This, Penn asserts, would effectively bar tacking of successive adverse possessions, which are, by definition,

not linked by paper transfers where there is no color of title. This position is not in accordance with the general weight of authority nor is it a desirable rule. 7 R. Powell, The Law of Real Property § 1021, at 758 (Rohan rev. ed. 1979).

In *Ringstad v. Grannis*, 171 F.2d 170 (9th Cir. 1948) (construing Compiled Laws of Alaska § 3354, the territorial predecessor of AS 09.10.030), the court observed "[t]hat the adverse possession may be by different occupants, where a privity exists between them, is almost universally held." *Id.* at 174 (citations omitted). To establish the requisite privity, the court stated:

> It is generally held that if, in connection with the conveyance of lands, there are circumstances showing an intent to transfer to the grantee the possession of other adjacent land occupied by the grantor and not covered by the deed, there is created such a privity that the grantee is permitted to tack the period of the grantor's occupancy to his own in establishing title by adverse possession to the land not mentioned in the deed. "Where the deed is followed by the delivery of possession of the entire inclosure, it is sufficient evidence of a transfer of possession to raise the requisite privity between the parties."

It is the transfer of possession, not title, which is the critical element, because a paper transfer is not necessary to connect adverse possessions. The privity required is that there must be a continuous possession by mutual consent, so that

---

4. It is well recognized that a fence, as a matter of law, is "one of the strongest indications of adverse possession." *Albert v. Declue*, 526 S.W.2d 39, 40 (Mo.App.1975). *Accord, Knapp v. Wise*, 122 Ariz. 327, 594 P.2d 1023 (App. 1979); *Gospel Echos Chapel, Inc. v. Wadsworth*, 19 Ariz.App. 382, 507 P.2d 994 (1973); *Cole v. Burleson*, 375 So.2d 1046 (Miss.1979); *Swecker v. Dorn*, 593 P.2d 1055 (Mont.1979).

5. AS 09.25.010(b) provides:
   No estate or interest in real property, other than a lease for a term not exceeding one year, nor any trust or power concerning the property may be created, transferred or declared, otherwise than by operation of law, or by a conveyance or other instrument in writing subscribed by the party creating, transferring, or declaring it or by his agent under written authority and executed with the formalities that are required by law. This subsection does not affect the power of a testator in the disposition of his real property by will, nor prevent a trust's arising or being extinguished by implication or operation of law, nor affect the power of a court to compel specific performance of an agreement in relation to the property.

the possession of the true owner shall not constructively intervene.

*Id.* (citations omitted).[6]

We believe the requisite privity has been established in the case at bar to justify the trial court's application of the doctrine of tacking. Mrs. Porter testified that it was her intent to purchase the property enclosed within the fence.[7] Mr. Ivey also testified that he thought he owned the fence. There was further testimony to this effect by Mrs. Ivey who stated that they bought both the house and the driveway.

The trial court's judgment in favor of the adverse claimants is AFFIRMED.

Q. And, what you actually bought was what was described in the deed however it was described?

A. We bought the land that was inside that fence as far as we were concerned.

* This case was submitted to the court for decision prior to Justice Boochever's resignation.

---

6. *See also* 7 R. Powell, The Law of Real Property § 1021, at 758 n.10 (Rohan rev. ed. 1979).

7. The pertinent part of the transcript reads as follows:

Q. Well, did you buy the ground inside the fence or did you buy a lot 5A?

A. We just bought the land inside the fence.