*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

|  |  |  |
|---|---|---|
| JANICE L. PARK, | ) | |
| | ) | Supreme Court No. S-18592 |
| Appellant, | ) | |
| | ) | Superior Court No. 3AN-20-04710 CI |
| v. | ) | |
| | ) | O P I N I O N |
| KAREN DECKER BROWN and | ) | |
| BRADLEY BROWN, | ) | No. 7703 – June 7, 2024 |
| | ) | |
| Appellees. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Andrew Guidi, Judge.

Appearances: Janice L. Park, pro se, Anchorage, Appellant. Paul J. Nangle, Paul J. Nangle & Associates, Anchorage, for Appellees.

Before: Maassen, Chief Justice, and Carney, Borghesan, Henderson, and Pate, Justices.

PATE, Justice.

## I. INTRODUCTION

A longstanding fence imperfectly divides two lots in south Anchorage. After a surveyor discovered the fence veered slightly from the platted property line into an adjacent lot, the owners of the adjacent lot sued their neighbor for trespass and to quiet title. The neighbor claimed adverse possession. The superior court ruled in favor

of the adjacent lot owners, concluding the neighbor failed to established the required elements of adverse possession.

The neighbor now appeals, arguing that the superior court misapplied the law and displayed bias against her. We agree that it was error to reject the claim of adverse possession. But we conclude there is insufficient evidence to support a claim of judicial bias. We reverse the judgment and remand for entry of judgment in favor of the neighbor.

## II.     FACTS AND PROCEEDINGS

### A.     Facts

Bradley Brown and Karen Decker Brown have owned a vacant lot in south Anchorage since 1991. Janice Park owns and resides on an adjacent lot. The lots share a common, north–south boundary, with the Browns' lot to the east and Park's lot to the west.

A chain-link fence runs from the southern meeting point of the lots to a point roughly halfway between the northern and southern borders. The fence does not follow the platted property line but instead runs slightly north-northeast, effectively annexing a thin, triangular portion of the Browns' lot to Park's backyard. We refer to this triangular portion as the "fenced area" and the area between the end of the fence and the northern boundary of the lot, following the bearing of the fence, as the "extrapolated area." The following diagram from the superior court's opinion depicts the situation of the properties:



Although it is not known who installed the fence, it has existed in its current location since at least 1991. Park and her then-husband, Jalal Husseini, acquired title in Husseini's name in 2002 and made their home on Lot 2. They planted a chokecherry tree in the extrapolated area around 2004. Park was added to the title in 2005.

Husseini filed for divorce in 2007.[1] The superior court ordered the sale of the home and Lot 2, granted Husseini's motion for a clerk's deed transferring Park's half interest to Husseini, and issued a writ of assistance ejecting Park from possession.[2] On appeal, we concluded the trial court had made insufficient findings to justify the order to sell the home and lot, and we consequently vacated both the trial court's order

---

[1]    *See Husseini v. Husseini*, 230 P.3d 682, 684 (Alaska 2010).

[2]    *Id.* at 684-85.

requiring sale and the clerk's deed.[3] On remand, the superior court awarded the home and lot to Park, and a clerk's deed affirming her title was issued in November 2010.

In 2016 the Browns commissioned a survey that revealed that the fence intruded into their lot. After receiving notice of the encroachment, Park responded in 2017 with a letter claiming she had already acquired title by adverse possession.

### B. Proceedings

The Browns sued Park to quiet title and for trespass in 2020. Park responded by asserting the affirmative defense of adverse possession. Park moved for summary judgment, which the court denied. After a one-day bench trial the superior court concluded that Park had failed to establish the elements of adverse possession, entered final judgment for the Browns, and awarded them attorney's fees and costs.

Park appeals.

## III. STANDARD OF REVIEW

We review legal questions and the application of law to facts de novo, adopting the rule of law that is most persuasive in light of precedent, reason, and policy.[4] We review factual findings for clear error and reverse "only when, 'after a review of the entire record, we are left with a definite and firm conviction that a mistake has been made.' "[5]

## IV. DISCUSSION

To acquire title to land by adverse possession, a claimant must prove continuous possession of the land for a period defined by statute. The claimant's possession must be open and notorious as well as exclusive and hostile to the record

---

[3]  *Id.* at 688-89.

[4]  *Collins v. Hall*, 453 P.3d 178, 185-86 (Alaska 2019); *HP Ltd. P'ship v. Kenai River Airpark, LLC*, 270 P.3d 719, 726 (Alaska 2012).

[5]  *Lee v. Konrad*, 337 P.3d 510, 517 (Alaska 2014) (quoting *Peterson v. Ek*, 93 P.3d 458, 463 (Alaska 2004)).

owner.[6]   An owner claiming adverse possession to a portion of an adjacent parcel because of a "good faith but mistaken belief that the real property lies within the boundaries" of the owner's own parcel must demonstrate that these elements existed for a continuous period of ten years.[7]   This ten-year period may be satisfied by successive adverse possessors, who may tack their periods of possession together if privity exists between them.[8]   To acquire title, the adverse claimant must prove each of the elements by clear and convincing evidence.[9]

The superior court found that the fenced and extrapolated areas were adjacent to Park's property and therefore properly considered within the scope of the statute governing adverse possession.   The court concluded that Park's possession of the fenced area was open, notorious, exclusive, and hostile, but that she did not exercise continuous possession of that area for the ten-year statutory period.   It also concluded that her possession of the extrapolated area was not open, notorious, exclusive, or hostile.

We hold that Park established continuous and uninterrupted possession of both the fenced area and the extrapolated area for the ten-year statutory period between 2005 and 2015.   While she did not herself maintain title or possession throughout that period, she satisfied the continuous-possession requirement under the doctrine of tacking.   We also hold that Park presented clear and convincing evidence sufficient to satisfy the other elements of adverse possession for the extrapolated area.

---

[6]     *Hurd v. Henley*, 478 P.3d 208, 214 (Alaska 2020).

[7]     AS 09.45.052(a).

[8]     *See Hubbard v. Curtiss*, 684 P.2d 842, 849 (Alaska 1984).

[9]     *Hurd*, 478 P.3d at 214.

**A.** **Park's Possession, Tacked With That Of Her Ex-Husband, Was Not Interrupted.**

The Browns argue that Park's possession was not continuous because it was interrupted between 2008 and 2010. In 2008 the superior court handling Park's divorce issued a clerk's deed conveying Park's interest in her property to Husseini, as well as a writ of assistance that removed Park from the property for several months.[10] The Browns argue that this interruption of Park's title and possession prevented her from establishing continuous possession for the ten-year statutory period required by statute.[11] We disagree.

The doctrine of tacking allows a property owner to claim title by adverse possession by tacking her period of possession to that of her predecessors in interest.[12] Adverse possessors in privity with each other may rely on this doctrine to meet the statutory duration requirements set out in AS 09.45.052, even when no single possessor has occupied the property for the full statutory period.[13] So long as successive occupants hold the property continuously and adversely to the true title holder, the current occupant may tack her period of occupancy to that of prior possessors to meet the statutory period.

Under this doctrine, Park may tack her possession to that of her ex-husband during the divorce proceeding to meet the ten-year statutory period between July 2005, when she was first added to the title, and July 2015.[14] The Browns point out

---

[10]   *Husseini v. Husseini*, 230 P.3d 682, 684-85 (Alaska 2010).

[11]   AS 09.45.052(a).

[12]   *See Ringstad v. Grannis*, 171 F.2d 170, 173-74 (9th Cir. 1948).

[13]   *See Penn v. Ivey*, 615 P.2d 1, 4-5 (Alaska 1980).

[14]   Because we conclude Park established all of the elements of adverse possession for the ten-year statutory period between July 22, 2005 and July 22, 2015, we do not address whether she may tack her most recent period of possession to any

that Park's interest was transferred to her ex-husband in October 2008, and Park did not reestablish title until November 2010. But that interruption does not break the continuity of Park's adverse possession claim: At all times during the relevant period, either Park or Husseini held possession and title adverse to the Browns, with no break in the adverse possession as against the Browns.[15] At no point did the Browns enter the disputed property or otherwise attempt to assert their title; the "dispossession of the true owner" continued uninterrupted.[16] Park testified that both she and Husseini understood their property to encompass the areas at issue in this case,[17] and the clerk's deed is

---

periods prior to 2005, including the 2002-2005 period when Park and Husseini occupied the property. We likewise do not address whether Park's period of good-faith adverse possession ended in 2016, when she learned of the results of the Browns' survey, or 2020, when this lawsuit was filed.

[15] *See Ringstad*, 171 F.2d at 174 (requiring continuous possession "so that the possession of the true owner shall not constructively intervene"); Henry W. Ballantine, *Title by Adverse Possession*, 32 HARV. L. REV. 135, 158 (1918) (explaining tacking applies where "[t]he same flag has been kept flying for the whole period," with title "consistently asserted and exercised as against the true owner"); *Gawf v. Gawf*, 240 P.2d 1095, 1099 (Okla. 1952) (concluding divorce decree did not interrupt possession); *accord, e.g.*, *Wilkinson v. White*, No. 1843, 2017 WL 563305, at *6 (Md. Spec. App. Feb. 13, 2017) (tacking together periods of possession by ex-spouses where one conveyed interest in property to other after divorce); *Farid v. DiLieto*, No. NNHCV135034680, 2014 WL 5472182, at *7-8 & n.9 (Conn. Super. Sept. 30, 2014) (same).

[16] *See Ill. Steel Co. v. Budzisz*, 81 N.W. 1027, 1033 (Wis. 1900) (describing continued dispossession of record owner as "the only essential" element of continuity).

[17] The Browns point out that Husseini did not testify at trial. But Husseini died in 2018 and was therefore unavailable. In an affidavit, Park explained that Husseini "routinely parked vehicles" in the extrapolated area, joined Park in planting a tree in the extrapolated area, and never "considered any possibility that the fence was not the true boundary." She also testified that the couple's dogs were kept within the fence, including in the fenced area. The Browns put forward no reason to think Husseini believed a thin slice of his fenced yard actually belonged to his neighbors.

sufficient to establish privity.[18]  That is all that is required for the doctrine of tacking to apply under the circumstances of this case.[19]

The superior court acknowledged that our case law recognizes the doctrine of tacking, but concluded that the doctrine did not apply in cases where the adverse claimant acts on the basis of a good-faith mistake that the disputed land lies within the boundaries of the claimant's own property.  Alaska Statute 09.45.052(a) recognizes two kinds of adverse possession claimants:  those who acted "under color and claim of title" and those who acted because of a good-faith mistake about a boundary line.

The superior court interpreted our decision in *Alaska National Bank v. Linck*[20] to support the conclusion that tacking applies only to cases involving a claim under color of title.  But *Linck* does not suggest this conclusion.[21]  We have recognized that the doctrine of tacking is generally applicable to all adverse possession claims, not only to claims made under color of title.[22]  While the superior court observed that the statute "makes no allowances for persons who do not have legal title," Park established that, during the period from October 2008 to November 2010, legal title was held by her predecessor in interest who shared her good-faith belief that the property

---

**18**      *See Ringstad*, 171 F.2d at 174 (requiring only "a continuous possession by mutual consent" among adverse possessors); *Ofuasia v. Smurr*, 392 P.3d 1148, 1155 (Wash. App. 2017) (concluding privity exists where there is "a reasonable connection between the successive occupants that will raise their claim of right above the status of wrongdoer or trespasser").

**19**      Because we conclude that the divorce litigation did not interrupt the continuity of Park's adverse possession claim, we do not address whether the clerk's deed conveying the property to her husband was merely void or, as Park argues, void ab initio.

**20**      559 P.2d 1049 (Alaska 1977).

**21**      *See id.* at 1052 n.7, 1053 n.11.

**22**      *See, e.g.*, *Penn v. Ivey*, 615 P.2d 1, 4-5 (Alaska 1980); *Hubbard v. Curtiss*, 684 P.2d 842, 849-50 (Alaska 1984).

encompassed the area of the Browns' lot that she now claims. While it may be unusual for title and possession to pass between adverse possessors by court order, as it did in this case, the result here was exactly what adverse possession requires: the continuous dispossession of the record owner for the ten-year statutory period by owners of adjacent real property who were in privity with one another. The doctrine of tacking thus permits Park to establish continuous and uninterrupted title and possession.

**B.      The 2003 Amendments To AS 09.45.052 Did Not Abolish Or Alter The Doctrine Of Tacking.**

At oral argument, the Browns appeared to suggest that the 2003 amendments to AS 09.45.052 may have abolished or altered the doctrine of tacking in Alaska, but we reject that suggestion. In 2003 the legislature modified the statute to limit the circumstances under which adverse possession is available.[23] The superior court, while not categorically ruling out the possibility of tacking, noted that its conclusion that "any periods of time when the claimant lacks a unity of possession *and* ownership of the adjacent parcel do not qualify toward meeting the ten-year requirement" was "consistent with the legislative intent behind the 2003 amendments."[24] But while the 2003 amendments did narrow the circumstances under which adverse possession may be claimed, we cannot agree that they abolished or altered the doctrine of tacking.

---

[23]      Ch. 147, SLA 2003; *see generally* Jennie Morawetz, Note, *No Room for Squatters: Alaska's Adverse Possession Law*, 28 ALASKA L. REV. 341 (2011).

[24]      Emphasis in original.

"Interpretation of a statute begins with its text."[25] "We give unambiguous statutory language its ordinary and common meaning,"[26] seeking to "give effect to the legislature's intent, with due regard for the meaning the statutory language conveys to others."[27] "Under our sliding scale approach to statutory interpretation, 'the plainer the statutory language is, the more convincing the evidence of contrary legislative purpose or intent must be' to guide our understanding of the statute."[28]

---

[25]    *Blythe P. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 524 P.3d 238, 246 (Alaska 2023) (quoting *Pruitt v. Off. of Lieutenant Governor*, 498 P.3d 591, 600 (Alaska 2021)).

[26]    *Roberge v. ASRC Constr. Holding Co.*, 503 P.3d 102, 104 (Alaska 2022) (quoting *Cora G. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 461 P.3d 1256, 1277 (Alaska 2020)).

[27]    *Ray v. State*, 513 P.3d 1026, 1033 (Alaska 2022) (quoting *City of Valdez v. State*, 372 P.3d 240, 254 (Alaska 2016)).

[28]    *Roberge*, 503 P.3d at 109 (quoting *Adamson v. Mun. of Anchorage*, 333 P.3d 5, 11 (Alaska 2014)).

Adverse possession in general[29] and the doctrine of tacking in particular[30] both have deep roots in the common law, and statutes modifying the common law must be interpreted narrowly.[31] We discern no clear intent in the text of AS 09.45.052(a) to abolish or alter the common-law tacking doctrine. The statute requires an "adverse claimant" to own "adjacent real property" for an "uninterrupted" period of 10 years.[32]

---

[29] *See* Minutes, H. Jud. Comm. Hearing on S.B. 93, 23rd Leg., 1st Sess. at 44 (May 18, 2003) (comments of Sen. Scott Ogan) (noting that change to adverse possession statute would "change hundreds of years of common law"), https://www.akleg.gov/PDF/23/M/HJUD2003-05-181045.PDF; 3 WILLIAM BLACKSTONE, COMMENTARIES *191, *196; *see also* Limitation Act 1623, 21 Jac. 1, c. 16, § 1 (Eng.), *reprinted in* 1 J. CHITTY, A COLLECTION OF STATUTES OF PRACTICAL UTILITY 700-02 (London, William Benning 1829) (imposing twenty-year statute of limitations for certain claims for recovery of real property); *accord* THE TWELVE TABLES VI.3 (c. 450 B.C.), *translated and reprinted in* ANCIENT ROMAN STATUTES 10 (Allan Chester Johnson et al. eds. & trans., 1961) (providing two-year period for prescription of real property); THE CODE OF HAMMURABI, KING OF BABYLON § 30, at 21 (Robert Francis Harper trans., 2d ed. 1904) (c. 1750 B.C.) ("If an officer or a constable . . . neglect his field, his garden, and his house and leave them uncared for (and) another after him take his field, his garden, and his house, and conduct his business for three years; if the former return and desire . . . his field, his garden, and his house, they shall not give them to him; he, who has taken (them) and conducted the business shall continue (to do so).").

[30] *See Fanning v. Willcox*, 3 Day 258, 259 (Conn. 1808) (recognizing that adverse possessors could tack continuous periods of possession under early Connecticut law); *Overfield v. Christie*, 7 Serg. & Rawle 173, 173 (Pa. 1821) (recognizing same under early Pennsylvania law); *Sargent v. Ballard*, 26 Mass. (9 Pick.) 251, 260 (1830) (recognizing same under early Massachusetts law). *But see Mazyck v. Wight*, 4 S.C.L. (2 Brev.) 151, 152 (S.C. Const. App. 1807) (disallowing tacking under early South Carolina law).

[31] *See Univ. of Alaska v. Shanti*, 835 P.2d 1225, 1228 n.5 (Alaska 1992) (observing statutes "which establish rights that are in derogation of common law are to be construed in a manner that effects the least change possible in common law"); ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 318 (2012) ("[S]tatutes will not be interpreted as changing the common law unless they effect the change with clarity.").

[32] AS 09.45.052(a).

The term "uninterrupted," a well-established element of adverse possession claims at common law,[33] does not suggest tacking is impermissible. "Uninterrupted" has appeared in Alaska's color-of-title adverse possession statute for over a century.[34] This word did not present any obstacle to our recognition of the doctrine of tacking in 1977.[35] The legislature's choice in 2003 to retain the same language we have construed to allow tacking does not demonstrate an intent to abolish or alter the tacking doctrine.[36] Nothing on the face of the statute otherwise suggests such an intent.

The legislative history underlying the 2003 amendments likewise betrays no intent to abrogate the doctrine of tacking. While the amendments "went further than any other state has gone in curtailing the application of adverse possession," the legislature's intent appears to have primarily been to limit the legal rights of "bad faith squatters," and not otherwise to modify the contours of the doctrine as applied in cases like this one.[37] One of the bill's sponsors stated that it would not "abolish all aspects

---

[33] *See Armstrong v. Morrill*, 81 U.S (14 Wall.) 120, 145 (1871) (describing requirement that possession be "continuous and uninterrupted" as "well-settled law"); *Unger v. Mooney*, 63 Cal. 586, 595 (1883) (identifying "continuous and uninterrupted" possession as element of adverse possession).

[34] § 1042, pt. IV, Carter's Annotated Alaska Code (1900) (requiring "uninterrupted" possession); § 1874 Compiled Laws Annotated (CLA) (1913) (same); § 4313 CLA (1933) (same); § 58-7-6 Alaska Compiled Laws Annotated (1949) (same).

[35] *See Alaska Nat'l Bank v. Linck*, 559 P.2d 1049, 1052 & n.7 (Alaska 1977); former AS 09.25.050 (1962).

[36] *See Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Hum. Res.*, 532 U.S. 598, 615-16 (2001) (Scalia, J., concurring) (explaining that, when the legislature "borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice," the legislature is presumed to know and adopt "the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed" (quoting *Morissette v. United States*, 342 U.S. 246, 263 (1952))).

[37] *See* Morawetz, *supra* note 23, at 341, 359-60, 369 (discussing legislative history of 2003 amendments).

-12-                                                                          7703

of adverse possession," but rather "eliminate the possibility that a landowner will lose property to a squatter who has no claim to the property."[38] The legislature sought to narrow the application of adverse possession to circumstances where adverse possession served a "continuing social utility," such as "[c]leaning up the fence that got built two feet on the wrong side of the property line."[39] "Tacking" was not mentioned at any point in the debates on the legislation. The chair of the Senate Judiciary Committee disclaimed the idea that the legislation would affect "a good faith mistake about someone's property line."[40] Given the legislature's desire to preserve "simple boundary dispute" adverse possession claims[41] and the lack of any indication that the legislature sought to abrogate our past decisions recognizing tacking,[42] we cannot conclude the legislature intended to alter the doctrine of tacking.

In light of the presumption against interpreting statutes in derogation of the common law and the absence of clear statutory language or legislative history to the

---

[38] Minutes, H. Jud. Comm. Hearing on S.B. 93, 23d Leg., 1st Sess. at 41 (May 18, 2003) (comments of Sen. Thomas Wagoner, sponsor of S.B. 93), https://www.akleg.gov/PDF/23/M/HJUD2003-05-181045.PDF. The legislation appears to have been motivated in part by the fact that some land owned by Alaska Native corporations was not protected from adverse possession and difficult to police for squatters. *See id.* at 43-44 (comments of Rep. Albert Kookesh).

[39] *Id.* at 45 (comments of Jonathan Tillinghast, lobbyist for Sealaska Corp.).

[40] Minutes, S. Jud. Comm. Hearing on S.B. 93, 23d Leg., 1st Sess. at 8 (May 6, 2003) (comments of Sen. Ralph Seekins, committee chair, and Sen. Wagoner), https://www.akleg.gov/PDF/23/M/SJUD2003-05-060806.PDF.

[41] Minutes, S. Jud. Comm. Hearing on S.B. 93, 23d Leg., 1st Sess. at 13 (Apr. 30, 2003) (comments of Tillinghast, lobbyist for Sealaska Corp.), https://www.akleg.gov/PDF/23/M/SJUD2003-04-301348.PDF.

[42] *See Shea v. State, Dep't of Admin., Div. of Ret. & Benefits*, 267 P.3d 624, 633 n.33 (Alaska 2011) ("We assume the legislature is aware of the common law when it passes legislation."); *Joseph v. State*, 293 P.3d 488, 492 (Alaska App. 2012) ("[T]he legislature is presumed to be aware of pertinent court decisions when it amends a statute."); *Cannon v. Univ. of Chi.*, 441 U.S. 677, 699 (1979) (same).

contrary, we conclude that the 2003 amendments to AS 09.45.052 did not abolish or alter the doctrine of tacking.

### C. Park Established Open, Notorious, Hostile, And Exclusive Possession Of The Extrapolated Area.

The superior court concluded that Park failed to establish open, notorious, hostile and exclusive possession of the extrapolated area, noting that this area was unfenced, that Park had not "perform[ed] any significant maintenance or place[d] any permanent or semi-permanent items or structures in the area," and that she had not "posted or marked the property as her own." It further concluded that this lack of fencing and signage meant she had not exercised exclusive control over the area.

To acquire land by adverse possession under AS 09.45.052(a), the claimant must prove by clear and convincing evidence that possession was continuous, open and notorious, and exclusive and hostile to the record owner.[43] The content of each of these requirements "depend[s] on the character of the land in question,"[44] and the purpose of each is the same: "to put the record owner on notice of the existence of an adverse claimant."[45]

In finding that Park's use of the extrapolated area was not open, notorious hostile, and exclusive, the superior court relied on our decision in *Tenala, Ltd. v. Fowler*.[46] In that case, we concluded that a claimant's use of land as an unimproved driveway and occasional storage area was insufficient to establish exclusive possession because that type of use did not put the record owners on notice that the claimants were

---

[43]   *Hurd v. Henley*, 478 P.3d 208, 214 (Alaska 2020).

[44]   *Nome 2000 v. Fagerstrom*, 799 P.2d 304, 309 (Alaska 1990) (emphasis omitted).

[45]   *Peters v. Juneau-Douglas Girl Scout Council*, 519 P.2d 826, 830 (Alaska 1974).

[46]   921 P.2d 1114, 1119-20 (Alaska 1996).

asserting a "possessory interest in the driveway strip."[47]  We concluded instead that these activities created an easement by prescription.[48]

Unlike the claimants in *Tenala*, Park was not merely using the extrapolated area to access her real property or store her personal property.  Instead, she maintained and improved the land in common with the rest of her property, mowing the area, clearing brush, parking cars, and, most notably, planting a chokecherry tree in the area along the extrapolated property line.[49]  The tree, which Park and Husseini planted around 2004, now stands 20 feet high and supports a swing.  These activities are as extensive as those at issue in our prior cases holding that land was acquired by adverse possession,[50] and suffice to have put the Browns on notice as to the existence of an adverse claimant.

The Browns raise the presumption of permissive use and argue Park has not rebutted this presumption.  But there is no evidence that Park ever sought or received the Browns' permission to use the extrapolated area, and Park has shown that she "at

---

**47**     *Id.* at 1119.

**48**     *Id.* at 1119-20.

**49**     The superior court did not make any express findings regarding the chokecherry tree.  To the extent that the findings that Park did not "place any permanent or semi-permanent items or structures in the [extrapolated] area" or "use[] the property in any way that was visibly inconsistent with the Brown's ownership" are inconsistent with the uncontradicted evidence that Park and Husseini planted the tree in the extrapolated area in 2004, those findings are clearly erroneous.  *See Gilboe v. Gilboe*, 789 P.2d 343, 345 (Alaska 1990).

**50**     *Hurd v. Henley*, 478 P.3d 208, 215 (Alaska 2020) (affirming recognition of successful adverse possession claim where claimant built shed and carport, parked vehicles, and put down gravel); *Alaska Nat'l Bank v. Linck*, 559 P.2d 1049, 1052-53 (Alaska 1977) (affirming same where claimant cleared land, maintained barricades, and kept property clean).

all times acted as if the land were [hers] and treated it as [hers]."[51] While a landowner may welcome a neighbor mowing part of his lawn or clearing away untidy brush, and the occasional parked car may reflect a neighborly courtesy, we cannot say planting a tree that has grown to a height of 20 feet is a reasonable neighborly use of adjacent property. We therefore conclude Park's use of the extrapolated area was inconsistent with permissive use of a neighbor's property.

For similar reasons, Park's use of the area also satisfied the exclusivity and hostility requirements for adverse possession. The superior court noted the "absence of any fencing," "lack of any signage," and non-payment of taxes in concluding Park's possession of the extrapolated area was not exclusive. Although evidence that the adverse possessor installed fencing and signage and paid taxes would tend to support an adverse possession claim, such evidence is not required to establish exclusivity or hostility. "Exclusivity requires only that the adverse possessor use the land 'as an average owner of similar property would use it.' "[52] Hostility likewise requires only that the claimant "act[] toward the land as if he owned it."[53] The record shows that Park landscaped and maintained the area as her own, in common with the rest of her property. She planted a tree in the area, cleared away brush, and landscaped, mowed, and maintained the area continuously and exclusively from at least 2005 to 2015. During this period the Browns never entered the area or challenged Park's possession of the area. Considering the nature and character of the land at issue, we conclude that Park's use comports with the sort of use a reasonable owner would make

---

[51]    *Peters v. Juneau-Douglas Girl Scout Council*, 519 P.2d 826, 833 (Alaska 1974).

[52]    *Yuk v. Robertson*, 397 P.3d 261, 265 (Alaska 2017) (quoting *Vezey v. Green*, 35 P.3d 14, 22 (Alaska 2001)).

[53]    *Hubbard v. Curtiss*, 684 P.2d 842, 848 (Alaska 1984) (quoting *Peters*, 519 P.2d at 832).

of a front yard of a residential lot in south Anchorage.[54]  Park did not need to do anything more with the extrapolated area, in light of its nature and location, to claim it as her own.

Cases from other jurisdictions provide support for our conclusion that Park's activities were sufficient to establish all the elements of adverse possession.  In *Chaplin v. Sanders*, the Washington Supreme Court concluded that a claimant had established the elements of adverse possession where the claimant "cleared, mowed, and maintained" the land at issue and used it for "guest parking, garbage disposal, gardening and picnicking."[55]  Particularly when, as here, a cleared and maintained property borders a vacant and overgrown lot, we agree with the Washington Supreme Court that the "contrast between the fully developed parcel . . . and the overgrown, undeveloped parcel" is sufficient to put the owner of the vacant lot on notice.[56]  The Wyoming Supreme Court has likewise noted that "enclosure of land" is not necessary to establish open and notorious use, and that planting trees on the land, maintaining the property, and showing a "distinction in vegetation" can suffice to establish the elements of adverse possession where such use is in keeping with the nature of the property.[57]

There is clear and convincing evidence that Park's use of the extrapolated area was open, notorious, hostile and exclusive, and that the boundary line she proposes is a logical one that reflects her use of the land.  On these facts, we conclude Park has

---

[54]    *See Vezey*, 35 P.3d at 22.

[55]    676 P.2d 431, 437 (Wash. 1984); *see also Krona v. Brett*, 433 P.2d 858, 861 (Wash. 1967), *overruled on other grounds by Chaplin*, 676 P.2d 431.

[56]    *Chaplin*, 676 P.2d at 437; *see also Frolund v. Frankland*, 431 P.2d 188, 190-91 (Wash. 1967), *overruled on other grounds by Chaplin*, 676 P.2d 431.

[57]    *Graybill v. Lampman*, 332 P.3d 511, 520-21 (Wyo. 2014); *see also Kranenberg v. Meadowbrook Lodge, Inc.*, 623 P.2d 1196, 1198-99 (Wyo. 1981) (concluding use of land as "yard space," including mowing and installing swing set, was sufficient to establish all elements of adverse possession).

proven by clear and convincing evidence that her use of the extrapolated area satisfied all the elements of adverse possession.[58]

### D. Park Did Not Demonstrate That The Judge Was Biased Against Her.

Finally, Park asserts that the superior court judge created an "appearance of impropriety and bias" by making comments that generally expressed opposition to the concept of adverse possession.[59] The court stated that it did not "really agree that it's a fair result for Ms. Park to actually have ownership of this strip of land," explaining that this result struck the court as "not equitable . . . probably because Ms. Park didn't pay for it." The judge expressed that he was troubled by the idea that "a mislocated fence which was wrongly placed suddenly creates a right," which he described as a "philosophical problem" he had "with the whole concept of adverse possession."

A judicial officer may be disqualified for bias if that officer "hears, learns, or does something intrajudicially so prejudicial that further participation would be unfair."[60] A party may also show judicial bias by "demonstrat[ing] that the court formed an unfavorable opinion of the party from extrajudicial information."[61] However, such a bias "cannot 'be inferred merely from adverse rulings.' "[62]

Park does not argue that the judge considered any extrajudicial information, and the comments made during the proceedings, which largely reflect the

---

[58] Although neither party raises the issue of attorney's fees on appeal, this conclusion necessarily affects the prevailing party analysis under Alaska Civil Rule 82. We therefore vacate the award of attorney's fees.

[59] We assume without deciding that the bias issue is properly before us. *See, e.g.*, *Mengisteab v. Oates*, 425 P.3d 80, 90 (Alaska 2018).

[60] *Downs v. Downs*, 440 P.3d 294, 300 (Alaska 2019) (quoting *Brown v. State*, 414 P.3d 660, 661 n.3 (Alaska 2018) (Winfree, J., concurring in part and dissenting in part)).

[61] *Id*. at 299.

[62] *Id.* at 299-300 (quoting *Kinnan v. Sitka Counseling*, 349 P.3d 153, 160 (Alaska 2015)).

judge's interpretation of the law,[63] are insufficient to show bias that would have made the judge's continued participation unfair.[64]  Park has therefore failed to demonstrate that the judge was improperly biased against her.

## V.    CONCLUSION

We REVERSE the judgment of the superior court, VACATE the award of attorney's fees against Park, and REMAND for entry of judgment in Park's favor.

---

[63]    *See Jourdan v. Nationsbanc Mortg. Corp.*, 42 P.3d 1072, 1082 (Alaska 2002) ("[I]nterpretations of the law are not sufficient to demonstrate the existence of bias.").

[64]    Although Park does not identify sufficient evidence to support a claim of judicial bias, she does identify points at which the court used sharp language in rejecting her arguments.  We take this opportunity to reiterate that judges are obligated to be "patient, dignified, and courteous to litigants."  Alaska Code Jud. Conduct 3B(4). While this duty applies equally in all cases, it may be especially salient when litigants appear without assistance of counsel.